UNITED STATES DISTRICT COURT

EASTERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| DKS, INC., | No. 2:15-cv-00132-MCE-DAD |
| Plaintiff, | |
| v. | **MEMORANDUM AND ORDER** |
| CORPORATE BUSINESS SOLUTIONS, INC.; OLIVER SINTOBIN; AND T.J. ELISON, | |
| Defendants. | |

Plaintiff DKS, Inc. ("Plaintiff") alleges multiple causes of action against Defendants Corporate Business Solutions, Inc. ("CBS"), Oliver Sintobin, and T.J. Elison (collectively, "Defendants"). Pending before the Court is Defendants' Motion to Compel Arbitration and Dismiss or Alternatively Stay Proceedings Pending Arbitration (ECF No. 11).[1]  For the reasons set forth below, Defendants' Motion is DENIED.[2]

///

---

[1] Plaintiff has asked the Court to take judicial notice of an online article that purports to demonstrate that Defendants are involved in a complex nation-wide scheme of defrauding businesses. ECF No. 16.  Defendants dispute the merits of this online article.  ECF No. 25.  The Court did not consider the article in its analysis of this matter, and Plaintiff's request for judicial notice (ECF No. 16) is therefore DENIED as moot.

[2] Because oral argument would not have been of material assistance, the Court ordered this matter submitted on the briefs.  E.D. Cal. Local R. 230(g).

# BACKGROUND[3]

Plaintiff is a plumbing subcontractor located in Sacramento, California. In December 2013, CBS's representative called Plaintiff and asked whether Plaintiff would be interested in engaging CBS's services to reduce Plaintiff's mounting debt and increase its dwindling profits. DKS agreed to meet with a CBS sales representative. On or about January 3, 2014, Craig Karr, a CBS sales representative, visited Plaintiff's office to discuss CBS's proposals and perform a "free business analysis." Additional meetings between Plaintiff and CBS took place on January 6 and 7, 2014. At these meetings, CBS represented that it intended to control Plaintiff's expenses and increase cash flow to save the company from insolvency. CBS indicated that it had the staff necessary to accomplish these tasks and would work closely with Plaintiff to develop and execute the financial plans. CBS also declared that all of its employees were bonded to the extent of $2 million for the protection of Plaintiff.

On January 8, 2014, a small team of CBS employees, including Elison and Sintobin, arrived at Plaintiff's office. This team presented a "Value Enhancement Plan" ("VEP") to Plaintiff the following day. The VEP reiterated the goals that CBS's sales representative had previously discussed. CBS represented that these goals would be achieved by CBS staff including a forensic bookkeeper, a business consultant, a tax consultant, and others. CBS would charge $350 per hour, travel and lodging expenses, and a per diem. CBS would also require weekly billing with payment due on receipt of the invoice.

The VEP was memorialized in a two-page consulting agreement (the "Agreement"). Above the signature line was an arbitration clause that provided: "Client and CBS expressly agree all disputes of any kind between the parties arising out of or in connection with this Agreement shall be submitted to binding arbitration which would be administered by the American Arbitration Association." Decl. of Richard N. Belcher, Ex.

---

[3] The following facts are taken, sometimes verbatim, from Plaintiff's Complaint (ECF No. 1).

A, ECF No. 11-1, at 2.  The parties signed the Agreement and CBS sent Sintobin to begin work as a business consultant.  CBS insisted that Sintobin be immediately installed as Plaintiff's chief financial officer so that he would have authority over all of Plaintiff's accounting.

In February 2014, in an effort to increase Plaintiff's sales numbers, Sintobin met with the general contractor of a contract on which Plaintiff was bidding.  At that meeting, Sintobin represented to the general contractor's executive vice president that Plaintiff had secured a $168,000 loan and was no longer struggling with cash flow.  Based largely on this information, the general contractor accepted Plaintiff's bid on the project.  Sintobin's statements were false—Plaintiff had not secured any loan.  Upon learning that Sintobin's representations where false, the general contractor removed Plaintiff from that and many other contracts, which resulted in losses of profits and costs already incurred.

Sintobin also falsely inflated Plaintiff's sales by billing Plaintiff's contracts for work not yet completed.  This was the only way for Sintobin to meet his published monthly sales target.  The result, however, was that the budget for some projects was depleted before work even began, creating the appearance of profit but leaving no budget to pay for the necessary equipment and labor.  By the summer of 2014, Sintobin had committed Plaintiff to over $7 million in contracts but left no capital available to complete the jobs.

Sintobin ordered Plaintiff to stop paying certain loans, characterizing them as predatory and possibly illegal.  CBS and Ellison assured Plaintiff that the loans would be refinanced and urged Plaintiff to retain RWI Business Services to restructure Plaintiff's debt and refinance the loans.  However, Sintobin soon ordered Plaintiff to take out another loan that was identical to the ones he had called predatory.  Sintobin also directed Plaintiff's principals to take out personal loans to cover expenses.

In July 2014, Sintobin suggested that he should be employed directly by Plaintiff as chief financial officer with a salary of $250,000, which is the amount he earned at CBS.  Plaintiff declined because it could not afford such an arrangement, but Sintobin met privately with Plaintiff's payroll company and represented that he was now a

principal with a salary of $250,000.  Given that Sintobin had been acting as chief financial officer, the payroll company complied.  As a result of this action, Plaintiff was not able to afford to pay its employees.

Even while Plaintiff was struggling to find enough cash to fund the work on in-progress projects, Defendants continued to write themselves checks to pay for their "consulting services."  Many of these checks were post-dated, and subsequent to Plaintiff's termination of Defendants' services, Plaintiff canceled payment on the checks.  This led to CBS instituting an arbitration action against Plaintiff on September 23, 2014 for the amount covered in the post-dated checks.  See Decl. of Richard N. Belcher, ECF No. 7-1, ¶ 9.

On January 16, 2015, Plaintiff filed this action alleging multiple causes of action against Defendants, including fraud in the inception, common law fraud, negligent misrepresentation, professional negligence, breach of fiduciary duty, constructive fraud, aiding and abetting breach of fiduciary duty, intentional and negligent interference with contractual relationship, intentional and negligent interference with prospective economic advantage, conversion, and deceptive business practices.  On May 4, 2015, Defendants filed the pending Motion to Compel Arbitration pursuant to the arbitration clause included in the Agreement the parties signed.

## STANDARD

"A written provision in . . . a contract evidencing a transaction involving commerce to settle by arbitration a controversy thereafter arising out of such contract or transaction . . . shall be valid . . . and enforceable, save upon such grounds as exist at law or in equity for the revocation of any contract."  Federal Arbitration Act, 9 U.S.C. § 2; accord Cal. Code of Civ. Proc. § 1281.  When a demand by one party for the other party to submit to arbitration has been refused, the aggrieved party may petition a United States district court to order the matter to arbitration.  9 U.S.C. § 4.

1     A district court should not exercise discretion when deciding whether to compel
2 arbitration when a lawful agreement has been signed.  <u>Dean Witter Reynolds, Inc. v.</u>
3 <u>Byrd</u>, 470 U.S. 213, 218 (1985).  The court must enforce an agreement to arbitrate,
4 absent a ground for revocation of the contractual agreement.  <u>Id.</u>  However, the validity
5 of an agreement containing an arbitration clause must be determined by a court before
6 the matter is sent to an arbitrator.  <u>See</u> <u>Moseley v. Elec. & Missile Facilities</u>, 374 U.S.
7 167, 171 (1963) ("it seems clear that the issue of fraud should first be adjudicated before
8 the rights of the parties under the subcontracts can be determined").  "To allow [the
9 question of the validity of a contract] to be determined by arbitrators would be to that
10 extent to enforce the arbitration agreement . . . ."  <u>Id.</u> at 172 (Warren, C.J., concurring).
11 "When determining whether the parties agreed to arbitrate a certain matter (including
12 arbitrability), courts generally should apply ordinary state-law principles that govern the
13 formation of contracts."  <u>First Options of Chicago, Inc. v. Kaplan</u>, 514 U.S. 938, 944
14 (1995).

## ANALYSIS

18     Defendants seek to enforce the arbitration clause in the Agreement.  In response,
19 Plaintiff contends that Defendants never intended to fulfill their end of the bargain and
20 that the contract is therefore void because of fraud in the inception of the Agreement.  ,
21 Plaintiff further argues that even if the arbitration agreement were enforceable, its
22 causes of action are far outside the scope of the arbitration clause.   Plaintiff also argues
23 that the contract is void due to unconscionability.  Because the Court finds that there
24 was fraud in the inception and that the causes of action fall outside the scope of the
25 arbitration clause, analysis of Plaintiff's unconscionability argument is not necessary.
26 ///
27 ///
28 ///

### A. The Contract is Void Because of Fraud in the Inception

Courts distinguish between fraud in the "inducement" and fraud in the "inception" of a contract.[4] Fraud in the inducement of a contract occurs when "the promisor knows what he is signing but his consent is <u>induced</u> by fraud, mutual assent is present and a contract is formed, which, by reason of the fraud is <u>voidable</u>." <u>Rosenthal v. Great W. Fin. Sec. Corp.</u>, 14 Cal. 4th 394, 415 (1996) (internal citations omitted). For a party to avoid any of an agreement's obligations, it must rescind the contract. <u>Id.</u> With fraud in the inception, on the other hand, "the fraud goes to the inception or execution of the agreement, so that the promisor is deceived as to the nature of his act and actually does not know what he is signing, or does not intend to enter into a contract at all." <u>Id.</u> In this circumstance, the promisor is not manifesting mutual assent to the agreement and the contract is <u>void</u>, therefore not requiring an aggrieved party to rescind the contract. <u>Duick v. Toyota Motor Sales, U.S.A., Inc.</u>, 198 Cal. App. 4th 1316, 1321 (2011). The issue of fraud, properly raised by the plaintiff, "must be initially determined by a court." <u>Ford v. Shearson Lehman American Express, Inc.</u>, 180 Cal. App. 3d 1011, 1022 (1986).

Defendants argue that, at most, the facts of this case can be construed as fraud in the inducement. The Court agrees that it appears from the facts that Plaintiff was persuaded to enter into the contract based on the promises made by CBS representatives, indicating some fraud in the inducement. However, for the reasons discussed below, the Court finds that Plaintiff adequately alleged fraud in the inception.

Defendants first argue that contrary to most fraud in the inception cases, Plaintiff voluntarily signed the Agreement after having sufficient time to read the document and consult with an attorney. There is no dispute that Plaintiff read and understood the contents of the proposed Agreement and subsequently signed the contract freely. "The central disputed question is whether plaintiffs could justifiably rely on [the defendant's] misrepresentations without themselves ascertaining the nature of the documents they

---

[4] Fraud in the inception is also referred to as fraud in the "execution" or "factum." The Court will refer to the doctrine as "fraud in the inception" for the sake of clarity and consistency.

6

signed." Rosenthal, 14 Cal. 4th at 419.

It appears to the Court that Plaintiff was not negligent for relying on Defendants' assurances and being unaware of the true nature of the agreement it signed. See Duick, 198 Cal. App. 4th at 1318-20 (finding fraud in the inception where the plaintiff believed she was agreeing to a personality test, but was actually agreeing to be pranked by the defendant's marketing representatives). In Duick, the Court of Appeal found that although the plaintiff indicated her agreement to the "Terms and Conditions" freely, she could not have known the true nature of what the defendant proposed to do. Id. at 1321.

Similarly, Plaintiff had no way of knowing what it was agreeing to when it signed the Agreement. Plaintiff believed it was entering into an arrangement with a business consulting company that would increase Plaintiff's profits. Defendants' promises and terms coincided with this understanding, but Defendants' true intentions and subsequent actions revealed a different intention. Cf. Ford, 180 Cal. App. 3d 1011 (finding fraud where plaintiff was not aware that in signing the agreements that authorized the defendant to exercise complete control over his assets he was actually facilitating the defendant's quest to unjustly enrich himself at the plaintiff's expense).

Defendants next argue that this case is distinct from other fraud in the inception cases in which the plaintiffs knowingly entered into a contract because many of those cases involved a fiduciary relationship between the victim of the fraud and the perpetrator. In Ford, for instance, the plaintiff was defrauded by his financial advisor who had the plaintiff sign a contract granting him complete access to the plaintiff's assets. 180 Cal. App. 3d at 1025. The advisor used his position to benefit from the plaintiff's assets without the plaintiff truly knowing what he was signing. Id. at 1025-26. Similar facts were at issue in a number of cases involving Dean Witter Reynolds, in which the plaintiffs signed contracts unknowingly giving Dean Witter Reynolds complete control over their securities investments. See, e.g. Rice v. Dean Witter Reynolds, Inc., 235 Cal. App. 3d 1016 (1991); Strotz v. Dean Witter Reynolds, Inc., 223 Cal. App. 3d 208 (1990). However, those cases do not require a fiduciary relationship between the victim and

perpetrator of the fraud to maintain a fraud in the inception claim. While the fiduciary relationship present in those cases led to more trust and reliance on the part of the plaintiffs, the fact that the plaintiffs were unaware of the true nature of what they were signing was the ultimate determining factor. Here, CBS's actions indicate that its intentions were drastically different from what was presented in the contract.

Defendants promised to send a number of staff members to Plaintiff's offices to assist in the financial overhaul. Plaintiff expected a forensic bookkeeper, a business consultant, a tax consultant, a chief financial officer, a project manager, an onsite senior business consultant, and an offsite business consultant, among others. Defendants sent only Sintobin. Not sending the promised personnel is a clear indication that Defendants never intended to provide the services it promised.

Instead of providing the agreed upon consulting services, Defendants manufactured an increase in cash flow that was designed to provide assets to pay the consulting fees but would ultimately only harm Plaintiff. First, Defendants falsified documents and lied to contractors in order to secure bids for Plaintiff. Then Defendants billed contractors on behalf of Plaintiff for work that had not been completed and use that money to pay themselves. Unfortunately, when the time came to actually do the work that had been billed by Defendants, there was no capital available to fund the labor. This is not a consulting attempt gone wrong; this is intentional behavior on the part of Defendants to benefit themselves at the expense of Plaintiff. This is behavior that Plaintiff could not have predicted and assented to when it entered into the short, form contract for consulting services.

As Plaintiff was unaware of CBS's true intentions, it was not able to give honest assent to the contract. The contract, and the arbitration agreement contained therein, is therefore void.

**B. Plaintiff's Claims are Outside the Scope of the Arbitration Clause**

Even if the contract was valid, Defendant's actions fall outside the scope of the arbitration clause. The arbitration clause in the contract that the parties signed reads,

"Client and CBS expressly agree all disputes of any kind between the parties <u>arising out of or in connection with this Agreement</u> shall be submitted to binding arbitration which would be administered by the American Arbitration Association." ECF No. 7-1 (emphasis added).

Defendants characterize this suit as one resulting from an unfortunate result of legitimate consulting, and state that the claims are therefore governed by the arbitration clause in the Agreement. However, Plaintiff does not bring this action against Defendants for the failure to perform the services promised. Rather, the causes of action are for the damage incurred by Plaintiff as a result of Defendants' extra-contractual actions. Plaintiff seeks reparation for the damage caused by the increase in debt, loss of cash flow, and loss of significant business all resulting from Defendants' actions that had nothing to do with the promises outlined in the parties' contract. For instance, Defendants were not providing business consulting services when Sintobin lied to a contractor to secure a job. Nor were they performing on the contract when Sintobin forced his way onto the payroll as chief financial officer.

Because the causes of action alleged in the Complaint do not "arise out of" and are not "in connection with" the consulting contract, Plaintiff is not bound by the arbitration clause.

## CONCLUSION

For the reasons set forth above, Defendants' Motion to Compel Arbitration and Dismiss or Alternatively Stay Proceedings pending Arbitration (ECF No. 11) is DENIED.

Subsequent to the briefing on Defendants' Motion, Plaintiff notified the Court that Sintobin has filed bankruptcy proceedings in the United States Bankruptcy Court for the Northern District of Texas. ECF No. 29. That proceeding instituted an automatic stay on all proceedings against Sintobin. Plaintiff has filed an Expedited Motion for Relief from the Stay in the bankruptcy action. Until the Bankruptcy Court in Texas issues a decision

1  on whether this matter can proceed as to Sintobin, this case is STAYED.  Once the
2  Bankruptcy Court issues its decision, the parties are required to notify the Court within
3  seven (7) days.
4       IT IS SO ORDERED.
5  Dated:  July 30, 2015

_____
MORRISON C. ENGLAND, JR, CHIEF JUDGE
UNITED STATES DISTRICT COURT